Catherine Cabalo, Esq. (CA Bar No. 248198)
Peiffer Wolf Carr & Kane
4 Embarcadero Center, 14th Floor
San Francisco, CA 94111
Telephone: 415.766.3592
Facsimile: 415.402.0058
Email: ccabalo@pwcklegal.com

*Attorneys for PLAINTIFFS*
*Abdul Nevarez and Priscilla Nevarez*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABDUL NEVAREZ and PRISCILLA NEVAREZ,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SAN FRANCISCO and DOES 1-10, Inclusive,<br><br>Defendants. | Case No. 19-cv-06155-SK<br><u>Civil Rights</u><br><br>*FIRST AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES<br><br>1. Violations of Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 et seq.)<br>2. Violation of the Rehabilitation Act of 1973 (29 U.S.C. § 794)<br>3. Violation of California Government Code Section 11135<br>4. Violations of the California Unruh Act (Cal. Civil Code § 51 *et seq.*) |

COME NOW Plaintiffs ABDUL NEVAREZ and PRISCILLA NEVAREZ (together "PLAINTIFFS") on behalf of themselves and all other similarly situated disabled persons in this civil rights action, and hereby complain of defendant CITY OF SAN FRANCISCO and DOES 1-10 as follows:

**INTRODUCTION**

1.      This is a civil rights action involving the lack of disabled access to the golf courses owned, operated, and/or leased by defendant CITY OF SAN FRANCISCO (the "CITY")

and also a lack of disabled access to the buildings, structures, facilities, complexes, properties, land, developments, and/or surrounding business complexes known as "Lincoln Park Golf Course," located at or about 300 34th Avenue, San Francisco, California 94121 (hereinafter "Lincoln Park"); "TPC Harding Park Golf Course," located at or about 99 Harding Road, San Francisco, California 94132 (hereinafter "TPC Harding"); and "TPC Fleming Golf Course," located also at or about 99 Harding Road in San Francisco (hereinafter "Fleming"). Upon information and belief, the CITY is an owner, operator, lessor, and/or lessee of Lincoln Park, TPC Harding, Fleming, and several other golf courses.

2.      Plaintiff ABDUL NEVAREZ (sometimes "MR. NEVAREZ") is physically disabled and requires the use of a wheelchair. MR. NEVAREZ was an avid golfer prior to the injury that rendered him disabled.  He has continued golfing to remain physically active after his injury, as it is one of the only recreational physical activities that he is able to enjoy regularly with his family and friends.

3.      Plaintiff PRISCILLA NEVAREZ (sometimes "MS. NEVAREZ") is MR. NEVAREZ's wife. She accompanies MR. NEVAREZ golfing and often assists with making arrangements for them to golf.

4.      At all times relevant herein and continuing, PLAINTIFFS were denied equal protection of the law and were denied civil rights under state and federal law. As set forth in detail herein, PLAINTIFFS were denied rights to "full and equal" access at the CITY's golf courses and to the benefits of "programs, services and activities" offered by the CITY because the CITY's programs, services, and activities were not "accessible to and useable by" persons with disabilities, such as MR. NEVAREZ, who requires accessible policies and use of accessible facilities. The denial continued despite the CITY having actual notice of the inaccessible

policies, conditions, and physical structures, demonstrating its deliberate indifference and/or intentional discrimination toward PLAINTIFFS. PLAINTIFFS seek injunctive relief to require the CITY to make its specified facilities accessible to disabled persons and to ensure that the "programs, services and activities" offered by the CITY be provided in a non-discriminatory manner to mobility disabled persons, including but not limited to: providing and maintaining safe accessible golf carts adequate to serve all golf courses that the CITY owns, operates, and/or leases; modifying its programs, services, and activities to provide for accessible tee time booking policies and procedures for all golf courses that the CITY owns, operates, and/or leases; and removing all architectural barriers at all golf courses that the CITY owns, operates, and/or leases. PLAINTIFFS seek damages and injunctive relief requiring provision of access under the Americans with Disabilities Act of 1990 ("ADA") and Rehabilitation Act of 1973 and injunctive relief for full and equal access and statutory damages under California law. PLAINTIFFS also seek declaratory relief and recovery of reasonable statutory attorney fees, litigation expenses and costs under federal and state law.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction of this action pursuant to 28 USC § 1331 for violations of the ADA, 42 USC §§ 12101 *et seq*. Pursuant to supplemental jurisdiction, attendant and related causes of action arising from the same facts are also brought under the Unruh Civil Rights Act, California Civil Code §§ 51, 52.

6.     Venue is proper in this court pursuant to 28 USC § 1391(b) and is founded on the fact that the real property which is the subject of this action is located in this District and that PLAINTIFFS' causes of action arose in this District.

First Amended Complaint
Case No. 19-cv-06155-SK

7.      This case should be assigned to the San Francisco Division of the Northern District of California, as the real property which is the subject of this action is located in this intradistrict and PLAINTIFFS' causes of action arose in this intradistrict.

## PARTIES

8.      At all times relevant to this Complaint, MR. NEVAREZ is qualified as a "physically disabled person" and a "person with a disability," within the meaning of the ADA, § 504 of the Rehabilitation Act of 1973, and Unruh Civil Rights Act. MR. NEVAREZ's right leg is amputated above the knee and he has significant nerve damage in his left leg and left arm. He requires use of a wheelchair for mobility. He possesses a disabled parking placard and/or license plate issued by the State of California, entitling him to park in designated accessible and van-accessible parking spaces.

9.      Plaintiff PRISCILLA NEVAREZ does not have a disability, but she assisted MR. NEVAREZ with and accompanied him to all the events described in this Complaint.

10.     The CITY and DOES 1-5 are public entities subject to Title II of the ADA, the Rehabilitation Act of 1973, and to all other legal requirements referred to in this Complaint, who are the owners, operators, lessors, and/or lessees of Lincoln Park, TPC Harding, Fleming, and other CITY golf courses. Defendant DOES 6-10 are employees and/or agents of the CITY and/or Lincoln Park, TPC Harding, or Fleming. The true names or capacities, whether individual, corporate, associate, or otherwise of defendants DOES 1-10 are unknown to PLAINTIFFS, who therefore sue said defendants by such fictitious names. PLAINTIFFS are informed and believe, and thereon allege, that each of the fictitiously named defendants is in some manner legally responsible for the events and happenings herein referred to, which caused injury and damages to

First Amended Complaint
Case No. 19-cv-06155-SK

PLAINTIFFS as herein alleged. PLAINTIFFS pray for leave of court to amend this Complaint to show such true names and capacities when the same have been ascertained.

11.     PLAINTIFFS do not know the relative responsibilities of the CITY and DOES 1-10 in the ownership and operation of the facilities herein complained of, but is informed and believes, and on such information and belief alleges, that at all times mentioned herein, defendants, and each of them, were the agents, servants, employees, and representatives of each of the other defendants, and performed all acts and omissions stated herein within the scope of such agency or employment or representative capacity, and/or as part of a joint venture and common enterprise with one or more of the other defendants, and are responsible in some manner for the acts and omissions of the other defendants in proximately causing the damages complained of herein. All actions alleged herein were done with the knowledge, consent approval and ratification of each of the defendants herein, including their managing agents, owners, and representatives.

## FACTUAL ALLEGATIONS

12.     The CITY has discriminated against PLAINTIFFS because its golf courses and policies related to its golf courses do not comply with the requirements of the ADA, Rehabilitation Act of 1973, and Unruh Civil Rights Act. The CITY has failed and refused to provide full and equal access to the services, privileges, benefits and advantages that it provides to nondisabled persons at its golf courses, including but not limited to Lincoln Park, TPC Harding, and Fleming. The CITY failed to make reasonable accommodations for PLAINTIFFS, even though doing so is feasible and readily achievable given the CITY's resources, and the CITY cannot demonstrate that making the requested accommodations would fundamentally alter the nature of the services, programs, or activities offered at its golf courses.

13.     The CITY has also discriminated against PLAINTIFFS by failing to remove numerous architectural barriers at Lincoln Park, TPC Harding, Fleming, and its other golf courses that prevent wheelchair users from golfing at the courses and utilizing the services offered in the buildings serving the courses.

14.     The CITY has knowingly and intentionally denied persons with mobility disabilities the full and equal enjoyment of its businesses, services, privileges, advantages, and accommodations. The CITY has engaged in this discriminatory conduct despite the fact that its services, business practices, contracts, and contractual relationships could easily be brought into compliance with the ADA, Rehabilitation Act of 1973, and the Unruh Civil Rights Act, and despite the fact that the CITY is and has been fully aware that its conduct and business practices have and continue to cause harm to persons with mobility disabilities including segregation and exclusion. The foregoing violations of the ADA, Rehabilitation Act of 1973, and Unruh Civil Rights Act are illustrated by the experiences of PLAINTIFFS, which are set forth in the paragraphs below.

15.     PLAINTIFFS have attempted to visit golf courses owned, operated, and/or leased by the CITY (together the "CITY's golf courses" or "CITY golf courses") as paying customers multiple times in the last two years and encountered barriers (both physical and intangible) that interfered with, if not outright denied, their ability to use and enjoy the goods, services, privileges and accommodations offered at the CITY's golf courses.

16.     On August 24, 2018, PLAINTIFFS called Lincoln Park to confirm that it would have an accessible golf cart available for MR. NEVAREZ to use for an August 25, 2018 at 9:50 a.m. tee time that PLAINTIFFS had scheduled online on August 20, 2018. However, they were not able to reach anyone, as the phone kept ringing without being answered every time they

First Amended Complaint
Case No. 19-cv-06155-SK

called. After searching online, they found contact information for the ADA Facility Coordinator for the CITY's Recreation and Parks Department (the "Department"), Paulina Araica, and called Ms. Araica to request a fully accessible golf cart for MR. NEVAREZ. Ms. Araica explained that the only accessible cart they had was the cart depicted on the Department's website under "Facility Accessibility" for golf courses. PLAINTIFFS explained to Ms. Araica that the "accessible" golf cart on the Department's website is a SoloRider golf cart, which requires substantial upper body strength and hand/arm function in order to operate, and as a result, is not accessible to many people with mobility disabilities, such as MR. NEVAREZ. PLAINTIFFS had no choice but to cancel their reserved tee time. They asked Ms. Araica to follow up with them. PLAINTIFFS confirmed their August 24th call with Ms. Araica via email on August 27, 2018, and again asked her to get back to them as soon as possible about whether the Department would obtain a fully-accessible golf cart, such as a ParaGolfer, so that MR. NEVAREZ could golf at Lincoln Park and other CITY golf courses.

17.     After receiving no response to their August 24th email, PLAINTIFFS emailed Ms. Araica on August 31, 2018. Ms. Araica responded via email on September 4, 2018. She indicated that she was forwarding PLAINTIFFS' email requests to the "ADA Coordinator for Program Access" and "Director of Property Management, Permits and Reservations" for review. Ms. Araica promised that they would investigate and contact PLAINTIFFS promptly with their findings. Also on September 4th and shortly after Ms. Araica's email, PLAINTIFFS received an email from Lucas Tobin, the "Supervisor for Therapeutic Recreation and Inclusion Services" for the Department, who indicated that he received PLAINTIFFS' inquiry and would be working with the CITY's Mayor's Office on Disability "to look into it."

First Amended Complaint
Case No. 19-cv-06155-SK

18.     On September 10, 2018, PLAINTIFFS followed up via email with Mr. Tobin, Ms. Araica, and Dana Ketcham, who was copied on Ms. Araica's and Mr. Tobin's earlier emails to PLAINTIFFS. PLAINTIFFS noted that they would like to golf at the CITY's golf courses while the area enjoys nice weather. PLAINTIFFS did not receive a prompt response to their email.

19.     After almost two weeks of no response to their September 10th email, PLAINTIFFS followed up via email on September 23, 2018 to Mr. Tobin, Ms. Araica, and Ms. Ketchum. PLAINTIFFS received no response until over a week after that, when Mr. Tobin emailed them on October 1, 2018 to confirm that the Department was going to upgrade accessible golf equipment and that it was "beginning that process by researching vendors, options, how many units [the Department] [ ] would need, etc." Mr. Tobin also noted that once the Department answers these questions, that it would take time to purchase equipment and for the vendor to deliver. He assured PLAINTIFFS that the Department was prioritizing upgrading the equipment, but he also wanted to manage expectations that the upgrades would not "happen overnight."

20.     PLAINTIFFS received no response to their October 1st email for three months. On January 2, 2019, they finally received an email from Mr. Tobin confirming that the Department was "still moving forward with efforts to purchase ParaGolfer carts for [the Department's] [ ] golf courses." Mr. Tobin noted that the "plan is to purchase two ParaGolfers, to be housed at Harding Park, and transported to other courses with sufficient notice." He assured PLAINTIFFS that he would keep them apprised regarding the Department's progress in acquiring the ParaGolfers.

21.     On June 20, 2019, after almost six months of no contact from the CITY, PLAINTIFFS emailed Mr. Tobin to determine the status of the CITY's efforts. In a responsive

email, Mr. Tobin confirmed that the Department purchased and received two ParaGolfer carts for use at the CITY's golf courses, and that one ParaGolfer will be housed at TPC Harding and one at Lincoln Park. Mr. Tobin also noted that "providing at least five business days' advance notice for transporting [ParaGolfers] will help ensure availability."

22.    PLAINTIFFS emailed Mr. Tobin on August 8, 2019 to ask why it would take five days of notice to transport a ParaGolfer. PLAINTIFFS emphasized that with their schedule, they often do not know if they are able to golf until the morning of, and they would like to be able to golf any open tee time that is available when their schedule allows. In a responsive email, Mr. Tobin clarified that the five-business-day notice requirement applies only if a ParaGolfer has to be moved from Lincoln Park or TPC Harding. Thus, if PLAINTIFFS needed one ParaGolfer only at either Lincoln Park or TPC Harding and no one else was scheduled to use the ParaGolfer being stored there, PLAINTIFFS could make a last-minute tee time at either of those courses with a ParaGolfer.

23.    On or about August 19, 2019, PLAINTIFFS booked a tee time online to golf at Lincoln Park at 9:00 a.m. on August 23, 2019. They called Lincoln Park to confirm that they would need the ParaGolfer, and the Lincoln Park employee they spoke with, "Lance," said that someone from the CITY has to come out and that process usually takes three days. He told PLAINTIFFS he would call them back. When "Lance" called back, he left a message that the ParaGolfer would be available for PLAINTIFFS for their tee time; that "Jerry" would be their contact that day; and that a representative from the CITY, "Lyn," would be also be at Lincoln Park.

24.    On August 22, 2019, PLAINTIFFS changed their August 23rd tee time online from 9:00 a.m. to 7:30 a.m. They tried to call Lincoln Park four times to let the course know they

had changed their tee time and to ensure the ParaGolfer would be available at their new tee time. On all four attempts to call, PLAINTIFFS received a busy signal or were directed to the course's voice mail, on which they left a message each time. That same day, August 22nd, PLAINTIFFS emailed Mr. Tobin to alert him of the difficulties they had contacting Lincoln Park and to confirm the ParaGolfer would be ready for their new tee time. Mr. Tobin was out of the office at the time, so PLAINTIFFS' email was forwarded to Lyn Nelson, also with the Department. Ms. Nelson responded to PLAINTIFFS that the ParaGolfer would be available for their new tee time and also noted, "I believe Lance informed you that it is fine for you to park in an area we refer to as 'the courtyard' adjacent to the putting green and clubhouse."

25.     Lance never informed PLAINTIFFS of any parking, and when PLAINTIFFS arrived at Lincoln Park on August 23rd, they did not see parking in or near a "courtyard." They drove to two parking lots directly across the street (i.e. Legion of Honor Drive) from Lincoln Park, however, PLAINTIFFS did not see any accessible parking spaces in either lot or any signage indicating where accessible parking was located. PLAINTIFFS parked their truck in a regular parking stall in one of the two lots and MS. NEVAREZ got out of the truck to locate an accessible path of travel from the parking lots to the main Lincoln Park building ("Clubhouse") for MR. NEVAREZ.

26.     MS. NEVAREZ saw that the asphalt where the parking lots exit onto Legion of Honor Drive was in serious disrepair – the asphalt dipped down in several locations and had many cracks. When she walked across the street to the Clubhouse, she did not see an accessible entrance to the Clubhouse, including the Pro Shop that is part of the Clubhouse. The entrance to the Pro Shop had a step with no ramp, and MS. NEVAREZ did not see any ramps or another way for MR. NEVAREZ to enter the building, so MS. NEVAREZ determined that she would

have to enter the Clubhouse on her own to pay for both of them. She also determined that MR. NEVAREZ would not be able to access the restaurant in the Clubhouse, the Lincoln Park Bar & Grill. She returned to the truck and told MR. NEVAREZ that she did not see any ramp that he would be able to use at the Clubhouse.

27.     MS. NEVAREZ unloaded MR. NEVAREZ's wheelchair from the back of the truck, and he transferred onto his wheelchair. A woman parked nearby approached them and introduced herself as Lyn Nelson. She told PLAINTIFFS that they could move their truck, but PLAINTIFFS noted that they had already unloaded, and MR. NEVAREZ was situated in his wheelchair.

28.     PLAINTIFFS and Ms. Nelson attempted to exit the parking lot to get to the Clubhouse. However, MR. NEVAREZ's front wheels of his wheelchair got stuck in the cracks in the asphalt where the parking lot exit abuts the street, and he almost fell out of this wheelchair. Luckily, he caught himself. He tried to "pop" the front wheels out of the cracks, but he got stuck again and almost fell again. Once PLAINTIFFS managed to get MR. NEVAREZ's wheelchair out of the parking lot, they proceeded to cross the street. A car was approaching at the time, and MS. NEVAREZ had to yell out to stop MR. NEVAREZ and Ms. Nelson from proceeding since they were not in a crosswalk and the car was not stopping. Traffic in this area was -- and upon information and belief continues to be -- dangerous for pedestrians and particularly anyone with a mobility disability, as crosswalk designations and signage were/are inadequate to alert drivers of pedestrians in this area or to alert pedestrians of an accessible path of travel.

29.     Upon PLAINTIFFS and Ms. Nelson approaching the Clubhouse, a Lincoln Park employee brought out the ParaGolfer and MR. NEVAREZ transferred into the ParaGolfer. MS. NEVAREZ asked Ms. Nelson where the restrooms were. Ms. Nelson stated that the men's

restroom was downstairs and the only way to access it was to go down the stairs, confirming that MR. NEVAREZ would not be able to use the restroom in the Clubhouse even if he could somehow enter the building. Ms. Nelson stated that there was also a restroom on the 6th hole. She said the women's restroom was inside the Clubhouse and that she would open it up for MS. NEVAREZ. MR. NEVAREZ did not have to use the restroom at that time but did shortly after this exchange with Ms. Nelson. However, knowing there was no accessible entrance to the Clubhouse and that the men's restroom was down the stairs, he was unable to use the restroom.

30.     MS. NEVAREZ was forced to go in and pay by herself since MR. NEVAREZ could not enter the Pro Shop with his wheelchair.

31.     Per Ms. Nelson's suggestion, MS. NEVAREZ walked to get PLAINTIFFS' truck to move it to an area in front of the Pro Shop that Ms. Nelson referred to as the "Courtyard." Moving the truck in this manner was very awkward and embarrassing for PLAINTIFFS because the "Courtyard" space was not constructed to be a parking area and PLAINTIFFS' truck took up the entire area in front of the Clubhouse and Pro Shop. Nonetheless, MS. NEVAREZ backed the truck up all the way to the Pro Shop.

32.     The Pro Shop had "Cart Path Only" signs, indicating that golf carts are to remain on cart paths only, but a Lincoln Park employee gave PLAINTIFFS a blue flag so that they could take the carts on the course.

33.     The grass was wet since it was first thing in the morning. PLAINTIFFS made it to the 5th hole where MR. NEVAREZ started to experience operation issues with the ParaGolfer. He teed off on the 5th hole, which was a flat surface and hit the ball into the fairway. Then the ParaGolfer started to malfunction. The steering did not work properly, and MR. NEVAREZ could not go straight forward. The back tire was pulling him left or right when he tried to go

forward. MS. NEVAREZ noticed the ParaGolfer's rear tire looked like it had low tire pressure. Upon information and belief, the other tires had low tire pressure as well. With the tire(s) being low, the ParaGolfer had to work extra hard on the wet grass and appeared to overheat.

34.     With the ParaGolfer out of commission, MR. NEVAREZ was forced to transfer into the golf cart that MS. NEVAREZ was driving, and he almost fell while transferring. PLAINTIFFS drove back to the Pro Shop and told an employee there that the ParaGolfer was on the 5th hole, its rear tire was low, and it wasn't working. PLAINTIFFS pulled up to their truck, both very upset.

35.     Earlier while they were getting ready to go out and golf, someone put MR. NEVAREZ's wheelchair in the bed of PLAINTIFFS' truck. This made it difficult to get the wheelchair out since the bed of the truck was backed up with no room for the tailgate to open to unload the wheelchair properly because of the quirky "Clubhouse" parking situation. MS. NEVAREZ was forced to maneuver MR. NEVAREZ's wheelchair out of the bed of the truck without being able open the tailgate and get behind it to unload properly. She helped him get out of the golf cart and unloaded his clubs and all of their stuff back in the truck.

36.     Once PLAINTIFFS were loaded up, Ms. Nelson walked up and asked what happened. PLAINTIFFS told her that the tire was low on the ParaGolfer and it stopped working on the 5th hole. She apologized and asked if they wanted to wait and see what was going on with the ParaGolfer. However, by that time, PLAINTIFFS were already loaded up and MR. NEVAREZ was exhausted, embarrassed, emotionally deflated, and too upset to golf. PLAINTIFFS thanked Ms. Nelson and told her they would like to come back once the ParaGolfer was fixed. They let Ms. Nelson know that MS. NEVAREZ's schedule varies and that they would have to determine when they would be able come out again but that they would like

to come back soon. They also told her that they may not know five days in advance if they are able to golf but would like to be able to golf as soon as they determine their availability if the ParaGolfer is available at that time. They suggested that Lincoln Park fill up the ParaGolfer's tires and take it out on a drive around the course to ensure it works properly. Lincoln Park issued a refund back to MS. NEVAREZ's credit card.

37.    A few days later, PLAINTIFFS checked their schedule and decided that their best golf day would be on Labor Day. They booked a tee time online at Lincoln Park for September 2, 2019 at 9:00 a.m.

38.    Ms. Nelson sent PLAINTIFFS an email on August 27, 2019, in which she said that she noticed they made a reservation for Labor Day at Lincoln Park but that the Department was:

> assessing the cart and whether it can effectively operate at Lincoln
> due to the steepness of the slopes.. [sic] We do not at this point
> have confidence in its operation and are very disappointed. We are
> trying to determine a path of travel that the Para-Golfer can safely
> operate.

> We believe that it would operate better at Fleming (Harding is still
> booked solid until after 2:10 as of now) and can make a tee time
> for you at 9:00 if you would prefer.

The same day, PLAINTIFFS responded via email to Ms. Nelson and confirmed that they would go ahead and play at Fleming on Labor Day at 9:00 a.m. Upon information and belief, Fleming is a nine-hole golf course that was added to the interior of TPC Harding in 1961. The same

amenities (e.g. parking lots, Pro Shop, restaurant, etc.) service both TPC Harding and Fleming. On August 28, 2019, Ms. Nelson confirmed that the ParaGolfer would be available at Fleming for PLAINTIFFS for their tee time on Labor Day.

39.    When PLAINTIFFS checked in for their tee time at Fleming on Labor Day, they paid $38 per person for nine (9) holes of golf, whereas they would have paid $46 per person for eighteen (18) holes at Lincoln Park. PLAINTIFFS were frustrated that they had to pay almost the same price for half of the number of holes because they were forced to golf at Fleming instead of Lincoln Park.

40.    While golfing at Fleming on Labor Day, PLAINTIFFS noticed the rear tire of the ParaGolfer had low tire pressure as they had experienced earlier at Lincoln Park. They alerted an employee, who filled the tires. PLAINTIFFS golfed at Fleming as scheduled with no problem.

41.    On September 16, 2019, PLAINTIFFS emailed Ms. Nelson to give her four days of notice that they intended to golf at Fleming with friends on September 20th and would need a ParaGolfer that day for MR. NEVAREZ. Ms. Nelson replied the same day that she had "reached out to Harding to confirm arrangements" and would let them know "tomorrow." However, Ms. Nelson did not confirm arrangements as promised. Fearful that they would not be able to golf as scheduled, PLAINTIFFS emailed Ms. Nelson on September 19th to confirm that a ParaGolfer would be available for MR. NEVAREZ. Ms. Nelson responded that the ParaGolfer would be ready for them for their tee time the next day.

42.    When PLAINTIFFS arrived at Fleming/TPC Harding on September 20th, all of the wheelchair accessible parking spaces were taken so they were forced to park further away from the entrance to the main buildings. Since MR. NEVAREZ requires a van-accessible parking stall, PLAINTIFFS were forced to take up two parking spaces. They ended up a far

distance from the entrance, so MS. NEVAREZ carried MR. NEVAREZ's golf clubs and their

bag while they did their best to negotiate safely through the parking lot with cars driving in and

out around them, since the parking lot did not have a marked or otherwise obvious pedestrian

path of travel.

43.     Exhausted from carrying all of their gear, MS. NEVAREZ left the gear with MR.

NEVAREZ to watch outside while she checked both of them in so that she would not have to

carry the items all the way into the Pro Shop. After checking them in and requesting the

ParaGolfer be brought out, she went outside to wait with MR. NEVAREZ. Despite Ms. Nelson's

assurances that the ParaGolfer would be ready for their tee time, PLAINTIFFS waited at least

fifteen (15) minutes before MS. NEVAREZ went back into the Pro Shop to ask about the status

of the ParaGolfer. A few minutes later, an employee finally brought out the ParaGolfer and MR.

NEVAREZ transferred to it. PLAINTIFFS and their friends proceeded to golf at Fleming.

44.     MS. NEVAREZ was given a regular golf cart to use during their tee time at

Fleming. However, regular golf carts are equipped with GPS tracking that prohibits the cart from

going on the course. TPC Harding/Fleming employees disabled the GPS for MS. NEVAREZ's

golf cart when PLAINTIFFS golfed at Fleming on Labor Day, but employees failed to disable

the GPS for MS. NEVAREZ on September 20th. MS. NEVAREZ found it extremely difficult

and exhausting to golf with and assist MR. NEVAREZ that day, because she was forced to park

her cart off to the side and run to where the ball was throughout the day.

45.     On September 24, 2019, PLAINTIFFS emailed Ms. Nelson to ask if the

upcoming PGA Championship at TPC Harding (the "Tournament") would be accessible so that

they can attend, including MR. NEVAREZ being able to use a ParaGolfer during the event and

the event having accessible paths of travel, viewing areas at each hole, and parking. Ms. Nelson

did not respond, so PLAINTIFFS emailed her again on October 6, 2019 to follow up so that they could finalize plans to attend the Tournament with their friends. Ms. Nelson responded on October 6th and copied Mr. Tobin, explaining that the Department was not running the Tournament, that the Department needed to look into what the PGA's normal accessibility is, and that site plans were in the process of being determined. PLAINTFFS responded the next day that the Tournament needs to be fully accessible per ADA laws, not where the PGA decides it will allow access. On October 8th, Mr. Tobin chimed in on the email thread, apologizing for the error in Ms. Nelson's email, noting:

> The tournament plan must meet ADA requirements and will not be governed by what PGA of America has done at other sites.
>
> However, we need their overall site plan, including areas that are not open to the public, to develop a full plan. We don't have those yet. We will keep you updated as we have more information.
>
> At this point we do not plan to make the Paragolfers available other than for golf play.

PLAINTIFFS have not heard back from Mr. Tobin, Ms. Nelson, or anyone from the Department about the accessibility at the Tournament.

46.     In another email dated September 24, 2019, PLAINTIFFS asked Ms. Nelson when they would be able to return to Lincoln Park. Ms. Nelson did not respond, so PLAINTIFFS emailed her again on October 6, 2019 to follow up. They were particularly disappointed by Ms. Nelson's failure to respond because the weather in the Bay Area was particularly beautiful at the

time, and MR. NEVAREZ's friends invited him to join them to golf but PLAINTIFFS were unable to join because they were waiting for a response from Ms. Nelson.

47.     Ms. Nelson responded via email on October 6th, explaining that they are "working on some issues with the Para Golfer." In her email, Ms. Nelson blamed the failure of the ParaGolfer at Lincoln Park on "slopes of the some of the fairways being in excess of 17 degrees." She indicated that Fleming has the "flattest topography" and that they have asked customers to play that course until they can "determine alternate routes that avoid inclines and declines in excess of 17 degrees."

48.     In a reply email also on October 6th, PLAINTIFFS clarified that the ParaGolfer died on a flat area when MR. NEVAREZ was teeing off, not on a slope. PLAINTIFFS explained that the issues they observed with the ParaGolfer were maintenance issues, not terrain issues. PLAINTIFFS noted that over a month had passed since they were last at Lincoln Park and yet they continued to be ignored. They asked if they were being ignored because Lincoln Park's facilities and restrooms were inaccessible, they reiterated that they were frustrated by missing out on golfing with friends while the weather was nice, and they confirmed that they would like to golf at all of the CITY's golf courses, not just Fleming. PLAINTIFFS did not receive a response from Ms. Nelson or anyone from the Department.

49.     In November 2019, although PLAINTIFFS wanted to golf at Lincoln Park, because of the Department's failure to confirm when PLAINTIFFS would get access to a ParaGolfer at Lincoln Park, PLAINTIFFS scheduled a tee time at TPC Harding. When PLAINTIFFS checked tee times online, morning tee times at TPC Harding were approximately $127 per person versus $48 per person for morning tee times the same day at Lincoln Park. PLAINTIFFS ended up scheduling the first tee time on November 21, 2019 at a lower rate at

TPC Harding at 1:10 p.m., which cost $85 per person. The same tee time at Lincoln Park would have cost them $31 per person.

50.     When booking the November 21st tee time, PLAINTIFFS noted in their reservation that MR. NEVAREZ would need a ParaGolfer. MS. NEVAREZ called TPC Harding's Pro Shop to confirm the ParaGolfer would be available for their tee time. She spoke with a female employee who confirmed the ParaGolfer would be ready and available for their use on November 21st.

51.     CITY representatives initially objected to PLAINTIFFS' request for a tee time at TPC Harding, indicating concerns that the ParaGolfer could not handle some of the slopes at TPC Harding. CITY representatives tried to convince PLAINTIFFS to golf at Fleming instead. Nonetheless, PLAINTIFFS continued to request a tee time at TPC Harding, given the publicity that TPC Harding has received since partnering with the PGA to bring the Tournament to TPC Harding and the fact that they had already golfed at Fleming twice. CITY representatives noted that PLAINTIFFS may be able to golf at TPC Harding, but with restrictions on where they could go on the course.

52.     On November 21, 2019, PLAINTIFFS went to TPC Harding for their tee time. PLAINTIFFS were unable to find disabled accessible parking near the entrance to the main buildings that serve TPC Harding and Fleming. They ended up double-parking in an area near a cement island in the parking lot.

53.     PLAINTIFFS arrived early to see if they could get an earlier tee time. However, when PLAINTIFFS entered the Pro Shop to check in, store racks obstructed MR. NEVAREZ's path to the check-in area. The check-in counter did not have an unobstructed lowered section, so

MR. NEVAREZ was unable to check-in himself. MS. NEVAREZ was forced to check in for both of them.

54.     PLAINTIFFS were able to rebook for an 11:00 a.m. tee time and a TPC Harding employee told them there would be no restrictions on where they could go on the course with the ParaGolfer that day. This last-minute news was disappointing to PLAINTIFFS, as they had two friends who declined to join them that day because of the restrictions the CITY had insisted upon earlier in order to golf at TPC Harding. PLAINTIFFS were paired with two other gentlemen for the 11:00 a.m. tee time.

55.     As with prior visits to Fleming, on November 21st, PLAINTIFFS requested that the GPS for MS. NEVAREZ's golf cart be disabled so that she could properly assist MR. NEVAREZ. However, the GPS system of MS. NEVAREZ's golf cart still limited her access to areas of the course. She was exhausted by having to run between her cart on the side and to assist MR. NEVAREZ with each of his shots.

56.     After PLAINTIFFS were done with their round of golf, MS. NEVAREZ walked to her and MR. NEVAREZ's truck and drove it to the entrance to the main buildings where MR. NEVAREZ was waiting, because TPC Harding does not allow the ParaGolfer to be operated in the parking lot. MR. NEVAREZ exited the ParaGolfer and got into his wheelchair.

57.     PLAINTIFFS then went to the restaurant to grab a drink at the bar, but the bar did not have an unobstructed lowered section that MR. NEVAREZ could access. Disappointed, MS. NEVAREZ bought a Gatorade drink from the bar and PLAINTIFFS left.

58.     In addition to the numerous problems with the CITY's policies at its golf courses (including without limitation tee time policies and policies regarding use of the ParaGolfer and regular golf carts accompanying ParaGolfers), upon information and belief, the buildings and

amenities that serve TPC Harding and Fleming are inaccessible in several respects, including

without limitation: (a) a lack of fully accessible parking areas; (b) a lack of an accessible path of

travel from parking to buildings, facilities, or elements of the courses; (c) a lack of an accessible

path of travel connecting the club house and practice area; (d) a lack of requisite directional

signage; (e) no access aisle serving an accessible passenger drop-off and loading area; (f) no

accessible section of counter in the Pro Shop; (g) inaccessible elements in the men's restroom;

(h) a lack of requisite accessible seating locations in the restaurant; and (i) an obstructed lowered

section of the counter at the bar in the restaurant.

59.     In addition to numerous problems with the CITY's policies at its golf courses

(including without limitation tee time policies and policies regarding use of the ParaGolfer and

regular golf carts accompanying ParaGolfers), upon information and belief, the buildings and

amenities that serve Lincoln Park are inaccessible in several respects, including without

limitation: (a) a lack of accessible parking; (b) a lack of an accessible path of travel from parking

to buildings, facilities, or elements of the course; (c) a lack of accessible entrances to the

Clubhouse and other buildings that serve the course; (d) multiple access barriers within the

Clubhouse, Pro Shop, and restaurant if a wheelchair user were able to enter the building; (e) a

lack of accessible restrooms; and (f) a lack of requisite directional signage.

60.     Upon information and belief, the other CITY golf courses, including Golden Gate

Park Golf Course, Gleneagles Golf Course, and Sharp Park Golf Course have similar

architectural access barriers and policy barriers.

61.     PLAINTIFFS would like to golf at all of the CITY's golf courses. Each golf

course has unique characteristics that make it different from the others. For example, each course

has a different level of difficulty, different terrain, different weather given its location, different

amenities (e.g. dining options); and unique views (e.g. Lincoln Park has iconic, stunning views of the Golden Gate Bridge from the 17th hole).

62.     PLAINTIFFS allege continuous and ongoing discrimination.  They want to – and plan to – golf at Lincoln Park, TPC Harding, Fleming, and all of the CITY's golf courses, and they are frustrated and anxious for the CITY to provide access to safe and well-maintained accessible golf carts; to provide reasonable modification in policies, practices, and procedures, as alleged herein; and remove architectural barriers so that they may golf the at all of the CITY's golf courses. PLAINTIFFS will continue to be injured by being deterred from visiting the CITY's golf courses for all times occurring after the filing of this Complaint to the time of final judgment.

63.     The barriers described above are only those that PLAINTIFFS encountered. They are presently unaware of other barriers which may in fact exist at Lincoln Park, TPC Harding, Fleming, and other CITY golf courses and relate to Mr. NEVAREZ's disabilities. PLAINTIFFS will seek to amend this Complaint once such additional barriers are identified, as it is their intention to have all barriers removed which exist at all CITY golf courses that limit full and equal access for persons with mobility disabilities.

64.     PLAINTIFFS' numerous complaints and claims to the CITY's, Lincoln Park's, and TPC Harding/Fleming's employees and representatives have been ignored or mishandled. PLAINTIFFS allege that it would be a futile gesture to provide further notices of violations relating to their continued, attempted visits and deterrence, which are certain to occur on a regular basis following the filing of this Complaint. Therefore, PLAINTIFFS will seek to supplement this Complaint at the time of trial as to subsequent events, according to proof.

First Amended Complaint
Case No. 19-cv-06155-SK

65.     The CITY knew, or should have known, that these policies, elements, and physical structures were inaccessible, violate state and federal law, and interfere with or deny access to the physically disabled. Moreover, upon information and belief, the CITY has the financial resources to remove these barriers and implement policy changes without much difficulty or expense and make its golf courses accessible to the physically disabled. To date, however, the CITY refuses to remove these barriers and make such changes.

66.     Upon information and belief, the CITY constructed and/or altered each of its golf courses without complying with federal or state access requirements/standards in effect at the time of the alterations and/or new construction. For example, upon information and belief, TPC Harding underwent a $16 million restoration featuring a complete re-design of the course. Additionally, the Golden Gate Park Golf Course erected a new temporary structure in July 2018 after the original clubhouse was destroyed by a fire on July 2, 2018.

67.     As a result of the CITY's actions and failures to act, as a result of the failure to provide disabled access, and as a result of the CITY's intentional discrimination and deliberate indifference, PLAINTIFFS have suffered a denial of their civil rights, physical injury, psychological and emotional discomfort, pain and suffering, denial of rights to full and equal access to public facilities, and programmatic access, all to their general, special, and statutory damages. MR. NEVAREZ has, on the occasion of each such denial of access, encountered barriers to full and equal access which have caused him difficulty, discomfort, and embarrassment. PLAINTIFFS have been required to seek legal assistance, and seek statutory attorney fees, litigation expenses, and costs, pursuant to federal and state law.

68.     TORT CLAIMS FILED – On February 21, 2019, PLAINTIFFS served claims on the CITY for all events through January 2, 2019. The CITY rejected PLAINTIFFS' claims on March 29, 2019.

69.     SECOND SET OF TORT CLAIMS FILED – On September 27, 2019, PLAINTIFFS sent claims to the CITY for all events from January 3, 2019 through September 2, 2019.

70.     FORTHCOMING THIRD SET OF TORT CLAIMS -- PLAINTIFFS intend to file additional claims with the CITY for events from September 16, 2019 to present. PLAINTIFFS acknowledge that these additional claims have not yet been served on the CITY and thus, reserve the right to amend this Complaint accordingly, based on the CITY's response, if any.

71.     PLAINTIFFS' goal in this suit is a positive one: to make the CITY's golf courses fully accessible to persons with mobility disabilities similar to MR. NEVAREZ and their companions.

**FIRST CLAIM:**
**VIOLATION OF THE ADA, TITLE II**
**[42 USC §§ 12201 *et seq.*]**
**(As to PLAINTIFFS ABDUL NEVAREZ and PRISCILLA NEVAREZ**
**against all defendants)**

72.     PLAINTIFFS replead and incorporate by reference, as if fully set forth hereafter, the allegations contained in all paragraphs of this Complaint and incorporate them herein as if separately repled.

73.     Effective January 26, 1992, MR. NEVAREZ was entitled to the protections of the "Public Services" provision of Title II of the Americans with Disabilities Act of 1990. Title II, Subpart A prohibits discrimination by any "public entity", including any state or local government, as defined by 42 U.S.C. § 12131.

24

74.     Pursuant to Title II of the ADA (42 U.S.C. § 12132), no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity. MR. NEVAREZ was at all times relevant herein a qualified individual with a disability as defined by the ADA.

75.     Public entity defendant CITY has failed in its responsibilities under Title II to provide its services, programs and activities in a full and equal manner to disabled persons as described herein, including without limitation: failing to ensure that the golf courses owned, operated, and/or leased by the CITY are properly accessible to and usable by mobility disabled persons; failing to ensure that related public facilities and public accommodations, as described herein, are accessible to and usable by mobility disabled persons; failing to remove known architectural barriers at the subject facilities so as to make the facilities accessible to and useable by mobility disabled persons; failing to comply with requirements and standards in effect at the time of alterations or construction of its golf courses; failing to implement and maintain policies at its golf courses to ensure that its golf courses are accessible to and usable by mobility disabled persons; charging more for its "designated accessible" golf courses; and/or failing to modify its programs, services and activities to make them accessible to and usable by mobility disabled persons, including MR. NEVAREZ. As a proximate result of the CITY's actions and omissions, PLAINTIFFS were discriminated against in violation of Title II of the ADA and of the regulations adopted to implement the ADA. PLAINTIFFS suffered damages, compensable under Title II for intentional acts of the CITY, including deliberate indifference, and have suffered physical, mental and emotional damages, including difficulty, discomfort or embarrassment.

76.     Under the regulation governing "[g]eneral prohibitions against discrimination," public entities are prohibited from "providing any aid, benefit, or service" that "afford[s] a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is *not equal* to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii) (emphasis added); *see also* 28 C.F.R. § 41.51 (Rehabilitation Act regulations). Public entities are also prohibited from utilizing "methods of administration ... [t]hat have the purpose or effect of

defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]" 28 C.F.R. § 35.130(b)(3)(ii). Public entities are required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.* § 35.130(b)(7) (emphasis added). The United States Court of Appeals for the Ninth Circuit Court has been clear that a public entity may violate the ADA even if no regulation expressly proscribes its particular conduct. *Barden v. City of Sacramento*, 292 F.3d 1073, 1076-78 (9th Cir. 2002) (applying Title II to sidewalks even though no implementing regulations specifically addressed sidewalks).

77.     On information and belief, to the date of filing this Complaint the CITY's golf courses continue to be inaccessible for safe and independent use by physically disabled persons such as MR. NEVAREZ. MR. NEVAREZ is unable, so long as such acts and omissions of the CITY continue, to achieve equal access to and use of these golf courses and cannot return to properly use and enjoy them until they are made properly accessible to mobility disabled persons. MR. NEVAREZ alleges that he intends to do so, once legally-required access has been provided. The acts of the CITY have proximately caused and will continue to cause irreparable injury to PLAINTIFFS if not enjoined by this Court.

78.     Plaintiff PRISCILLA NEVAREZ seeks relief pursuant to remedies set forth in 42 U.S.C. § 12203. She has been discriminated against in her attempts to assist MR. NEVAREZ with golfing at the CITY's golf courses. In addition, she has herself experienced discrimination as a result of struggling to assist MR. NEVAREZ with physical access and policy barriers that limit or deny access to the CITY's golf programs, services, activities and facilities, including but not limited to architectural and policy barriers that limit access to Lincoln Park, TPC Harding, and Fleming.

79.     Per § 12133 of the ADA, as a result of such discrimination, in violation of § 12132 of the ADA, PLAINTIFFS are entitled to the remedies, procedures and rights set forth in Section 505 of the Rehabilitation Act of 1973 (29 USC § 794a).

1

2

WHEREFORE, PLAINTIFFS request relief as outlined below.

3

4

### SECOND CAUSE OF ACTION:
### VIOLATION OF THE REHABILITATION ACT OF 1973
### [29 U.S.C. § 794]
### (As to Plaintiff ABDUL NEVAREZ only against all defendants)

5

6

7

80.    PLAINTIFFS replead and incorporate by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Complaint and incorporate them herein as if separately repled.

8

9

81.    Upon information and belief, at all times relevant to this action, the CITY, Department, and DOES 1-5 were recipients of federal funding within the meaning of the Rehabilitation Act of 1973. As recipients of federal funds, they are required to reasonably accommodate persons with disabilities in their facilities, programs, and activities.

10

11

12

13

82.    MR. NEVAREZ is a qualified individual with a disability as defined in the Rehabilitation Act of 1973. 29 U.S.C. § 705.

14

15

83.    By its policies and practices of discriminating against and failing to reasonably accommodate patrons with mobility disabilities, the CITY and the Department violated Section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 794.

16

17

18

84.    As a result of the CITY's and the Department's discrimination and failure to provide reasonable accommodations, MR. NEVAREZ and others with disabilities do not have equal access to the activities, programs, and services of the CITY's golf courses for which they are otherwise qualified.

19

20

21

22

85.    MR. NEVAREZ's injuries are ongoing so long as the CITY and the Department do not modify their policies and procedures and provide fully accessible golf courses and related facilities for MR. NEVAREZ and other persons with similar mobility disabilities.

23

24

25

WHEREFORE, PLAINTIFFS requests relief as outlined below.

26

//

27

//

28

//

**THIRD CAUSE OF ACTION:**
**VIOLATION OF CALIFORNIA GOVERNMENT CODE SECTION 11135**
**(As to Plaintiff ABDUL NEVAREZ only against all defendants)**

86.     PLAINTIFFS replead and incorporate by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Complaint and incorporates them herein as if separately repled.

87.     Upon information and belief, the CITY, the Department, the CITY's golf program, and DOES 1-5 receive financial assistance from the State of California. MR. NEVAREZ is a person with a disability within the meaning of California Government Code section 11135.

88.     The CITY, the Department, and the CITY's golf program denied MR. NEVAREZ full access to the benefits of their programs and activities for which they receive financial assistance from the State of California, and unlawfully subjected MR. NEVAREZ and other persons with disabilities to discrimination within the meaning of California Government Code section 11135(a) based on their disabilities.

89.     MR. NEVAREZ's injuries are ongoing so long as the CITY, the Department, and the CITY's golf program do not modify their policies and procedures and provide fully accessible golf courses and related facilities for MR. NEVAREZ and other persons with similar mobility disabilities.

WHEREFORE, PLAINTIFFS request relief as outlined below.

//

//

//

//

**FOURTH CLAIM:**
**VIOLATION OF UNRUH CIVIL RIGHTS ACT**
**[Cal. Civil Code §§ 51 *et seq.*]**
**(As to PLAINTIFFS ABDUL NEVAREZ and PRISCILLA NEVAREZ**
**against all defendants)**

90.     PLAINTIFFS replead and incorporate by reference, as if fully set forth again

herein, the allegations contained in all paragraphs of this Complaint and incorporate them herein

by reference as if separately repled hereafter.

91.     The Unruh Civil Rights Act, California Civil Code 51(b), provides that:

All persons within the jurisdiction of this state are free and equal, and no matter
what their sex, race, color, religion, ancestry, national origin, disability, or
medical condition are entitled to the full and equal accommodations, advantages,
facilities, privileges, or services in all business establishments of every kind
whatsoever.

92.     The CITY is a business establishment within the meaning of the Unruh Civil

Rights Act. The CITY is an owner and operator of a business establishment.

93.     The CITY violated the Unruh Civil Rights Act by its acts and omissions, as

follows:

A.     Failure to construct and/or alter Lincoln Park – and, upon information and

belief, other CITY golf courses -- in compliance with state building code

and state architectural requirements;

B.     Failure to modify policies and procedures as necessary to ensure

PLAINTIFFS full and equal access to the accommodations, advantages,

facilities, privileges, and/or services of the CITY's golf courses; and

C.     Violation of the ADA, a violation of which is a violation of the Unruh

Civil Rights Act. Cal. Civil Code § 51(f).

94.     PLAINTIFFS have experienced numerous physical barriers to access at Lincoln Park, TPC Harding, and Fleming; as well as in the policies and procedures of the golf courses; all of which have caused them major difficulty, discomfort and embarrassment. PLAINTIFFS suffered physical, mental and emotional damages, including statutory and compensatory damages, according to proof.

95.     Further, on information and belief, the CITY's golf courses and their respective premises are also illegally inaccessible in multiple other respects. The barriers to access described in this Complaint are listed without prejudice to PLAINTIFFS citing additional barriers to access after inspection by PLAINTIFFS' access consultant(s)/expert(s), per the Ninth Circuit's standing standards under *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034 (9th Cir. 2008) and *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939 (9th Cir. 2011) (*en banc*). These barriers to access render the CITY's golf courses and their respective premises inaccessible to and unusable by persons with mobility disabilities. All golf courses must be brought into compliance with all applicable federal and state code requirements, according to proof. PLAINTIFFS pray for leave to amend this Complaint to obtain full injunctive relief as to those barriers that limit or deny full and equal access to persons with mobility disabilities similar to MR. NEVAREZ's.

96.     Further, each violation of the ADA (as pled in the First Claim, *supra*, the contents of which are repled and incorporated herein as if separately repled), also constitutes a separate and distinct violation of California Civil Code § 51(f), thus independently justifying an award of damages and injunctive relief pursuant to California law, including but not limited to Civil Code § 52(a).

97.     With respect to the CITY's violations of the Unruh Civil Rights Act that are not predicated on violations of the ADA, the CITY's behavior was intentional: it was aware of

and/or was made aware of its duties to refrain from establishing discriminatory policies and barriers that prevent persons with mobility disabilities like MR. NEVAREZ's from obtaining full and equal access to the CITY's golf courses. The CITY's discriminatory practices and/or policies that deny full enjoyment of its golf courses to persons with physical disabilities indicates actual and implied malice and conscious disregard for the rights of MR. NEVAREZ and other similarly disabled individuals. PLAINTIFFS complained on several occasions to the CITY, to no avail. Accordingly, the CITY has engaged in willful affirmative misconduct in violating the Unruh Civil Rights Act.

98.     On information and belief, the access features of the CITY's golf courses and its policies and procedures have not been improved since PLAINTIFFS' most recent attempts to golf at a CITY golf course. PLAINTIFFS' injuries are ongoing so long as the CITY does not modify its policies and procedures and provide fully-accessible facilities for PLAINTIFFS and other persons with mobility disabilities similar to MR. NEVAREZ's.

99.     At all times herein mentioned, the CITY knew, or in the exercise of reasonable diligence should have known, that its barriers, policies and practices at its facilities violated disabled access requirements and standards and had a discriminatory impact upon PLAINTIFFS and upon other persons with mobility disabilities similar to MR. NEVAREZ, but the CITY failed to rectify the violations, and presently continues a course of conduct in maintaining barriers that discriminate against MR. NEVAREZ, similarly-situated disabled persons, and their companions.

WHEREFORE, PLAINTIFFS request relief as outlined below.

## PRAYER

1.     PLAINTIFFS have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint. PLAINTIFFS have suffered and will continue to suffer irreparable

injury as a result of the unlawful acts, omissions, policies, and practices of the CITY as alleged herein, unless PLAINTIFFS are granted the relief they request. PLAINTIFFS and the CITY have an actual controversy and opposing legal positions as to the CITY's violations of the laws of the United States and the State of California. The need for relief is critical because the rights at issue are paramount under the laws of the United States and the State of California.

WHEREFORE, PLAINTIFFS ABDUL NEVAREZ and PRISCILLA NEVAREZ pray for judgment and the following specific relief against the CITY:

2.      Issue a declaratory judgment that the CITY's actions, omissions, and failures, including but limited to: failing to provide and maintain safe and accessible golf carts for use by disabled patrons, failing to implement accessible tee time booking policies and procedures, failing to construct and/or alter CITY golf courses in compliance with requirements and standards in effect at the time of alterations and/or new construction, failing remove barriers where readily achievable, and failing to make reasonable modifications in policy and practice for PLAINTIFFS and other persons with similar mobility disabilities, violate the rights of PLAINTIFFS and other similarly situated persons under 42 U.S.C. §§ 12101 *et seq.* and the regulations promulgated thereunder and California Civil Code §§ 51 *et seq.*

3.      Issue an order enjoining the CITY, its agents, officials, employees, and all persons and entities acting in concert with it:

a.   From continuing the unlawful acts, conditions, and practices described in this Complaint;

b.  To provide reasonable accommodation for persons with disabilities in all its programs, services and activities at its golf courses;

c.  To ensure that persons with disabilities are not denied the benefits of, or participation in, programs, services, and activities at its golf courses;

First Amended Complaint
Case No. 19-cv-06155-SK

d. To modify the above-described facilities to provide full and equal access to persons with mobility disabilities, including without limitation the provision of a safe, accessible golf cart for use by persons with disabilities;

e. To remove all architectural barriers at CITY golf courses;

f. To maintain such accessible facilities once they are provided;

g. To train CITY employees and agents in how to accommodate the rights and needs of physically disabled persons at the CITY's golf courses;

h. To implement nondiscriminating protocols, policies, and practices for accommodating persons with mobility disabilities at CITY golf courses.

4.     Retain jurisdiction over the CITY until the Court is satisfied that the CITY's unlawful policies, practices, acts and omissions, and maintenance of inaccessible public facilities as complained of herein no longer occur, and cannot recur;

5.     Award to PLAINTIFFS all appropriate damages, including but not limited to statutory, compensatory, and treble damages in an amount within the jurisdiction of the Court, all according to proof;

6.     Award to PLAINTIFFS all reasonable statutory attorney fees, litigation expenses, and costs of this proceeding as provided by law, including but not limited to the ADA, 42 U.S.C. § 12205; the Unruh Civil Rights Act, California Civil Code § 52; and "public interest" attorney fees, litigation expenses and costs pursuant to the provisions of California Code of Civil Procedure § 1021.5.

7.     Award prejudgment interest pursuant to California Civil Code § 3291;

8.     Interest on monetary awards as permitted by law; and

9.     Grant such other and further relief as this Court may deem just and proper.

Dated: March 4, 2020               PEIFFER WOLF CARR & KANE

                                   _____/s/ Catherine Cabalo_____
                                   BY: CATHERINE CABALO, Esq.

First Amended Complaint
Case No. 19-cv-06155-SK

Attorneys for PLAINTIFFS
ABDUL NEVAREZ and PRISCILLA NEVAREZ

## **DEMAND FOR JURY**

PLAINTIFFS hereby demand a jury for all claims for which a jury is permitted.

Dated: March 4, 2020                    PEIFFER WOLF CARR & KANE

_____*/s/ Catherine Cabalo*_____
BY: CATHERINE CABALO, Esq.
Attorneys for PLAINTIFFS
ABDUL NEVAREZ and PRISCILLA NEVAREZ

First Amended Complaint
Case No. 19-cv-06155-SK